IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.  Case No. 3:10mj637

EYONGAGBANKEH TATAW,

Defendant.

## MEMORANDUM OPINION

Before the Court is Defendant Eyongagbankeh Tataw's Motion to Suppress. (Docket No. 8.) The United States has responded. (Docket No. 9.) On March 15, 2011, the Court held a hearing on the pending motion. The parties have filed court-ordered supplemental briefing (Docket Nos. 11, 12), and this matter is ripe for adjudication. The Court's jurisdiction is properly invoked under 18 U.S.C. § 3401.[1] For the following reasons, the Court GRANTS Tataw's Motion to Suppress.

### I. Procedural Background and Findings of Fact

#### A.  Procedural Background

On December 2, 2010, the United States filed a two-count Criminal Information against Tataw. Count One charges Tataw with operating a motor vehicle under the influence of alcohol, in violation of 18 U.S.C. § 13, assimilating Va. Code §§ 18.2-266(ii) and 18.2-270. Count Two charges Tataw with operating a motor vehicle on the highways of Virginia without a valid operator's license, in violation of 18 U.S.C. § 13, assimilating Va. Code § 46.2-300.

---

[1] On January 19, 2011, pursuant to 18 U.S.C. § 3401(b), Tataw consented to trial before a magistrate judge and waived trial, judgment, and sentencing by a district judge. (Docket No. 5.)

On January 19, 2011, the Court granted the United States's motion to dismiss Count Two of the Criminal Information. That same day, Tataw entered a plea of not guilty to Count One of the Criminal Information, and the matter was scheduled for trial by jury on March 30, 2011.

On February 1, 2011, Tataw filed a Motion to Suppress, arguing that the evidence against him must be suppressed as obtained pursuant to an unlawful stop in violation of his Fourth Amendment rights.[2] Tataw contends the Government did not have probable cause or reasonable articulable suspicion to conduct a traffic stop. The Government asserts that, at the time of the traffic stop, reasonable articulable suspicion existed to believe that Tataw was driving under the influence of alcohol.

B.  **Findings of Fact**

On March 15, 2011, the Court held a hearing on Tataw's Motion to Suppress. Based on the evidence heard, the Court makes the following factual findings.

At approximately 2:18 a.m. on November 15, 2010, Officer Ryan Fitzsimmons, an officer with the City of Hopewell Police Department, received a report of an intoxicated male causing a disturbance at the End Zone Club located at 2703 Oaklawn Boulevard. While en route to that location, Officer Fitzsimmons received information from dispatch that the intoxicated male had left the scene, driving west on Oaklawn Boulevard in a PT Cruiser with Virginia license plate

---

[2] The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

number XHW-7801. Officer Fitzsimmons thereafter located and followed a vehicle with Virginia license plate number XHW-7801. While this vehicle was not a PT Cruiser, it had a similar body style to the PT Cruiser. Officer Fitzsimmons followed this vehicle for approximately one hundred yards prior to passing beyond the City of Hopewell's jurisdiction and into the jurisdiction of Fort Lee. During that time, he did not observe any traffic violations or suspicious behavior. Officer Fitzsimmons sought and received permission from his sergeant to follow this vehicle beyond Hopewell's jurisdiction. Officer Fitzsimmons also advised his dispatch to notify Fort Lee that the vehicle in question was traveling through Fort Lee's jurisdiction.

At this point, the vehicle traveled in the right lane of a four-lane highway. Officer Fitzsimmons continued to follow and observe the vehicle for approximately one and a half to two miles. During this observation, Officer Fitzsimmons stated that the vehicle followed the speed limit but "then began to swerve from left to right, going over the solid line to the right and the [dotted] white line to the left and it did that approximately three times." (Suppression Hr'g Mar. 15, 2011 ("Mar. 15 Hr'g") 2:43:00-2:43:12.)[3] Officer Fitzsimmons further testified: "As we approached some railroad tracks, the vehicle went to the right and ran off the road almost completely to the right, kicking up dust just before the railroad tracks. The vehicle then c[a]me back onto the roadway, moved to the lefthand lane using its turn signal, and then ran off the road to the left side . . . and then came back onto the roadway in the left lane." (Mar. 15 Hr'g 2:43:18-

---

[3] All citations to the suppression hearing refer to the Court's digital audio file of that proceeding.

2:43:43.) Based on the observed weaving of the vehicle and his training and experience,[4] Officer Fitzsimmons suspected that the driver of the vehicle was under the influence of narcotics or alcohol, or was otherwise impaired. He did not, however, initiate a traffic stop because he was outside his jurisdiction. Instead, Officer Fitzsimmons notified dispatch of his observations and advised dispatch to notify Fort Lee that he "was now following the vehicle that was possibly driving under the influence." (Mar. 15 Hr'g 2:59:50-2:59:56.) Dispatch informed Officer Fitzsimmons that Fort Lee was responding to the notification that he "was behind a possible intoxicated driver." (Mar. 15 Hr'g 2:41:49-2:41:53.)

Officer Fitzsimmons then followed the vehicle in question as it turned left onto Lee Avenue, seeking access to Fort Lee through the Lee Avenue Gate.[5] Once the vehicle was granted access onto Fort Lee, Officer Fitzsimmons informed the gate guard of his observations and "that Fort Lee Police had been notified that [he] was following a possibly intoxicated driver." (Mar. 15 Hr'g 2:51:18-2:51:28.) The gate guard granted Officer Fitzsimmons access onto Fort Lee so that he could continue to follow the vehicle. Once on Fort Lee, Officer Fitzsimmons never lost sight of the vehicle in question and continued to follow the vehicle at a distance until he observed Fort Lee Police initiate a traffic stop of the vehicle.

At approximately 2:25 a.m. on November 15, 2010, Officer Patrick Puryear, an officer with the Fort Lee Police Department, received a dispatch via radio stating "that a Hopewell

---

[4] Officer Fitzsimmons has been a police officer for four years and has conducted hundreds of traffic stops. His training includes six months of training at the police academy, as well as re-certification training every year. Officer Fitzsimmons is a Patrolman, a Field Training Officer, and a Narcotics Canine Handler.

[5] Fort Lee is property administered by the Department of Defense within the special territorial jurisdiction of the United States and within the jurisdiction of this Court.

Police Officer was at Lee Gate. He was following a vehicle out of Hopewell. The vehicle was possible DUI, came through the Gate. Entered the installation. . . . The description was a silver in color PT Cruiser-style vehicle." (Mar. 15 Hr'g 3:10:20-3:10:38.) This dispatch also included the license plate number XHW-7801. (Mar. 15 Hr'g 3:06:32-3:06:36, 3:07:57-3:08:01.) Officer Puryear testified that the vehicle in question had entered the Fort Lee military installation prior to his receipt of the dispatch. (Mar. 15 Hr'g 3:12:22-3:12:26.) After receiving the dispatch, Officer Puryear drove toward Lee Avenue Gate, traveling on Battle Drive. He then identified a silver vehicle matching the description of the "be on the lookout" dispatch and traveling away from Lee Avenue Gate. (Mar. 15 Hr'g 3:03:58-3:04:01.) Officer Puryear saw other police vehicles following behind the suspect vehicle. Officer Puryear made a U-turn, pulled behind the vehicle in question, and conducted a traffic stop. Before initiating contact with the driver of the vehicle, but after the traffic stop, Officer Puryear spoke to Officer Fitzsimmons,[6] who had arrived on scene, and confirmed that the correct vehicle had been stopped.[7] Officer Puryear then approached the vehicle and identified the driver as Tataw. As a result of the traffic stop, Tataw received a charge for driving under the influence of alcohol.

---

[6] Officer Puryear also testified that, before initiating contact with the driver of the vehicle, he spoke to Lead Sergeant Purdue, who had also arrived on scene. (Mar. 15 Hr'g 3:05:40-3:06:02.) However, the Government failed to elicit any further information about Lead Sergeant Purdue or the substance of any communication between Officer Puryear and Lead Sergeant Purdue.

[7] Officer Fitzsimmons also testified that, after Officer Puryear initiated the traffic stop but prior to approaching the vehicle, he informed Officer Puryear about the earlier observed swerving and weaving. Officer Puryear, however, contradicted Officer Fitzsimmons when he testified that he did not receive any details regarding the manner in which the vehicle was driven. As discussed below, the Court finds this testimony to be irrelevant to the question of whether Officer Puryear had reasonable articulable suspicion at the time of the traffic stop. *See Infra* n.11.

## II. Analysis

Tataw argues that Officer Fitzsimmons's knowledge cannot be imputed to Officer Puryear to give him reasonable articulable suspicion or probable cause to conduct a traffic stop.[8] Although the Government failed to address the collective knowledge doctrine in its initial brief, after Court-ordered supplemental briefing, the Government now asserts that the collective knowledge doctrine applies to the facts of this case, giving Officer Puryear probable cause and reasonable articulable suspicion to conduct a traffic stop based on Officer Fitzsimmons's observations. As discussed below, the Court finds that the United States has not placed facts before the Court allowing it to apply the collective knowledge doctrine to the events surrounding this traffic stop. The Court thus finds that Officer Puryear did not have reasonable articulable suspicion when he initiated the traffic stop of Tataw's vehicle, and the evidence against Tataw must be suppressed.

### A. Applicable Law

"The touchstone of the Fourth Amendment is reasonableness. The Fourth Amendment does not proscribe all state-initiated seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (internal citation omitted). It is well-settled that "[a]n automobile stop is . . . subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Whren v. United States*, 517 U.S. 806, 810 (1996). However, it has long been recognized that probable cause is not "'an indispensable component of

---

[8] Tataw also contends that Officer Puryear did not have reasonable suspicion to conduct a traffic stop on his vehicle based on the dispatch's general description of the vehicle pursued by Hopewell Police. Because the Court disposes of this motion on other grounds, the Court need not reach this argument.

reasonableness.'" *United States v. Rendon*, 607 F.3d 982, 989 (4th Cir. 2010) (*quoting Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 665 (1989)).

If an officer has reasonable suspicion, based on articulable facts, that criminal activity is afoot, that officer may stop and briefly detain a person for investigative purposes without running afoul of the Fourth Amendment. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Terry v. Ohio*, 392 U.S. 1, 30 (1968). The Supreme Court of the United States has described reasonable articulable suspicion as "more than an inchoate and unparticularized suspicion or hunch" but "less . . . than probable cause." *Wardlow*, 528 U.S. at 123-24 (internal quotations omitted). Specifically, "[a]n officer has reasonable articulable suspicion to stop a car when he observes facts that suggest the driver is subject to stop for violation of the traffic laws." *United States v. Gupta*, No. 1:06-0237, 2006 WL 6093874, at *3 (E.D. Va. Sept. 11, 2006), *aff'd*, 230 F. App'x 270 (4th Cir. 2007) (*citing Delaware v. Prouse*, 440 U.S. 648, 663 (1979)).

In determining whether reasonable articulable suspicion existed, courts must look to the totality of the circumstances, including the information known to the officer at the time of the stop and any reasonable inferences to be drawn therefrom. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). The United States Court of Appeals for the Fourth Circuit has instructed: "Reasonable suspicion is a commonsensical proposition. Courts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street." *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993); *see also Arvizu*, 534 U.S. at 273 (permitting "officers to draw on their own experience and specialized training to make inferences

from and deductions about the cumulative information available to them that 'might well elude an untrained person'" (*quoting United States v. Cortez*, 449 U.S. 411, 418 (1981))).

B. **The Collective Knowledge Doctrine**

The Fourth Circuit has also recognized that, "under the collective knowledge doctrine (also known as the fellow officer rule), reasonable suspicion may be based on the collective knowledge of the officers involved in an investigation." *United States v. McRae*, 336 F. App'x 301, 305 (4th Cir. 2009) (*citing United States v. Hensley*, 469 U.S. 221, 232 (1985)). The Fourth Circuit has instructed:

> Under the collective knowledge doctrine, the collective knowledge of the police can be used in two different situations to establish probable cause even when the arresting officer himself does not have sufficient personal knowledge to independently establish probable cause. The first situation arises when one officer with personal knowledge of facts sufficient to establish probable cause orders another officer, who does not have personal knowledge of those facts, to make an arrest. In that situation, it is clear that "so long as the officer who orders an arrest . . . has knowledge of facts establishing probable cause, it is not necessary for the officers actually making the arrest . . . to be personally aware of those facts." In the second situation, an officer without independent knowledge of facts sufficient to establish probable cause makes an arrest, but the officer has been in communication with a group of officers that collectively has knowledge of facts sufficient to establish probable cause. "[W]hen a group of agents in close communication with one another determines that it is proper to arrest an individual, the knowledge of the group that made the decision may be considered in determining probable cause, not just the knowledge of the individual officer who physically effected the arrest."

*United States v. Joy*, 336 F. App'x 337, 342 (4th Cir. 2009) (*quoting United States v. Laughman*, 618 F.2d 1067, 1072-73 & n.3 (4th Cir. 1980)) (alterations in original). However, based on the evidence before the Court, neither of these two situations applies, making the Government's attempt to avail itself of the collective knowledge doctrine futile.

8

### C. Officer Fitzsimmons's Knowledge Cannot Be Imputed to Officer Puryear Under the Collective Knowledge Doctrine

Officer Fitzsimmons had ample reasonable articulable suspicion under the circumstances of this case to believe Tataw was driving under the influence of alcohol. He received two dispatches about an intoxicated male causing a disturbance and then leaving the scene in a PT Cruiser with Virginia license plate number XHW-7801. He then identified and followed the vehicle in question, observing the vehicle swerving and driving off the road numerous times during the early morning hours of November 15, 2010. Based on the late hour, the observed swerving, and his training, Officer Fitzsimmons had reasonable articulable suspicion to believe Tataw was driving under the influence of alcohol. Both Fourth Circuit and Virginia precedent support this finding. *See e.g., United States v. Banks*, No. 97-4810, 1998 WL 558757, at *1 (4th Cir. Aug. 28, 1998); *Lender*, 985 F.2d at 154; *Gupta*, 2006 WL 6093874, at *4; *Neal v. Commonwealth*, 498 S.E.2d 422, 425 (Va. Ct. App. 1998); *Freeman v. Commonwealth*, 460 S.E.2d 261, 262-63 (Va. Ct. App. 1995).

However, the Court also finds that the collective knowledge doctrine cannot apply to this case because Officer Fitzsimmons's knowledge and observations cannot be imputed to Officer Puryear. First, Officer Fitzsimmons did not request or order Officer Puryear or another officer to conduct a traffic stop on Tataw's vehicle. Instead, he merely informed Fort Lee that he was following a possibly intoxicated driver. The Government urges the Court to consider this an "indirect order" from Officer Fitzsimmons, suggesting that Tataw's "vehicle needed to be

9

investigated."[9] (Gov't's Supplemental Mem. 5.) The Court, however, declines to find that a message regarding a *possibly* intoxicated driver, especially when communicated via dispatch and not officer-to-officer, constitutes an indirect order to initiate a traffic stop. *See Joy*, 336 F. App'x at 342 (finding the communication to "[t]ry to get all three cars" to be an order to initiate a takedown of all three vehicles (*quoting* J.A. at 340)); *United States v. Wells*, 98 F.3d 808, 809-10 (4th Cir. 1996) (applying the collective knowledge doctrine where the supervising agent ordered the seizure of a firearm as evidence); *Laughman*, 618 F.2d at 1072 (applying the collective knowledge doctrine where the officer in charge of the investigation ordered other officers to board a vessel).

Second, based on the evidence presented, the Court cannot find that Officer Fitzsimmons was in close communication with Officer Puryear, or with Fort Lee Police. Officer Fitzsimmons testified that he advised his dispatch to notify Fort Lee that he was following a vehicle that was

---

[9] In supplemental briefing, the Government, at times, has characterized the testimony elicited at the suppression hearing in a careless manner. For example, the Government states that "Officer Puryear heard over the radio transmitter that a Hopewell Police Officer *was attempting to stop a vehicle* for a possibly DUI." (Position of the United States with Respect to Collective Knowledge Doctrine ("Gov't's Supplemental Mem."), at 7 (emphasis added).) However, the testimony elicited from both officers at the suppression hearing established that the message relayed merely indicated that a Hopewell Police Officer was following a possibly intoxicated driver. *See supra* Part I.B.

The Court mentions this variance from the elicited testimony because the United States appears to proffer its characterization in an effort to support the new arguments regarding the collective knowledge doctrine raised in the court-ordered supplemental briefing. The Government uses the "attempting to stop" language absent from recorded testimony to support an argument that an implied order to stop existed here. This effort fails because the testimony cannot sustain it.

Similarly, the United States contends for the first time via supplemental briefing that Lead Sergeant Purdue actually ordered Officer Puryear to further investigate Tataw's vehicle. However, the sworn testimony during the hearing is bereft of anything Purdue said. Lead Sergeant Purdue did not testify at the hearing. And while Officer Puryear testified that he spoke to Purdue after initiating the stop but prior to speaking to Tataw, he entirely failed to testify regarding the content of the discussion.

possibly being driven under the influence. He was later informed that Fort Lee was responding to the notification. Officer Fitzsimmons also told the gate guard of his observations[10] and that Fort Lee Police had been notified about the possibly intoxicated driver. Finally, Officer Puryear testified that he received a dispatch after the vehicle in question had entered Fort Lee stating that a Hopewell Police Officer was following a vehicle in which the driver was possibly under the influence and providing a detailed description of the vehicle in question.

Officer Fitzsimmons's communications to Fort Lee consistently indicated that he was following a vehicle for *possibly* driving under the influence. The Government failed to elicit any testimony as to what that message would objectively indicate to a police officer based on training and experience. Further, no evidence exists that would allow this Court to conclude that Fort Lee Police knew more details about Officer Fitzsimmons's observations of the vehicle in question.[11] Based on the limited, indirect communications containing sparse information that the

---

[10] When testifying, Officer Fitzsimmons did not elaborate to confirm which observations he relayed to the gate guard. The record also is silent as to what the gate guard passed along to other officers.

[11] In briefing, the United States asserts that Officer Fitzsimmons had informed Officer Puryear of his observations before Officer Puryear approached Tataw's vehicle and that this Court should weigh this fact when determining whether to apply the collective knowledge doctrine. First, Officer Puryear's testimony fell short of establishing what the Government now contends. Although the Government states in briefing that Officer Puryear did not remember being told about these observations, Officer Puryear's response at the suppression hearing was actually a denial. When asked if he had discussed "the manner of the defendant's driving with the Hopewell Police Officer," Officer Puryear responded, "No, I did not." (Mar. 15 Hr'g 3:15:18-3:15:33.) Officer Puryear testified that Officer Fitzsimmons did not relate his observations and instead merely confirmed that the correct vehicle had been stopped.
More importantly, the evidence shows that this conversation occurred after Officer Puryear initiated the traffic stop, but prior to speaking to Tataw. In determining whether or not probable cause or reasonable articulable suspicion exists, courts must look to the totality of the circumstances, including the information known to the officer and any reasonable inferences to be drawn *at the time of the stop*. *Arvizu*, 534 U.S. at 273. In other words, a traffic stop must be "justified at its inception." *Terry*, 392 U.S. at 20. Thus, information learned after the stop of the vehicle is not relevant to the inquiry before this Court.

Government elicited during the suppression hearing, the Court cannot make a finding that a group of officers in close communication with one another collectively determined to initiate a traffic stop of Tataw's vehicle.[12] *See Joy*, 336 F. App'x at 342 (applying the collective knowledge doctrine where a group of officers were in communication through the course of a "buy/bust" and shared detailed information about the defendants' involvement in the suspected criminal acts); *United States v. Wright*, 374 F. App'x 386, 388-89 (4th Cir. 2010) (applying the collective knowledge doctrine where a group of agents "were in constant radio communication with one another" and the "agents decided to effectuate a stop"); *United States v. Leak*, No. 3:09-cr-81-W, 2010 WL 1418227, at *7 (W.D.N.C. Apr. 5, 2010) (applying the collective knowledge doctrine where group of officers were in direct communication, spoke multiple times, and one officer informed the other officers that he had observed the defendant's vehicle run a stop sign).

Ultimately, the Court finds the Government has failed to show by a preponderance of the evidence that the seizure in this case was reasonable under the circumstances. *See United States v. Beckham*, 325 F. Supp. 2d 678, 682 (E.D. Va. 2004). Because the United States has not established facts allowing this Court to apply the collective knowledge doctrine, Officer Fitzsimmons's reasonable articulable suspicion cannot be imputed to Officer Puryear. This Court cannot find, nor does the Government contend, that Officer Puryear had reasonable articulable suspicion based solely on the description of the vehicle and the "possible driving under the influence" dispatch. Thus, the stop and seizure of Tataw violated his Fourth Amendment rights.

---

[12] In a final attempt to persuade this Court to apply the collective knowledge doctrine beyond the record created during the suppression hearing, the Government proffers information about Lead Sergeant Purdue's knowledge at the time of the stop and how several other officers were also in close communication. Because the Government failed to elicit any such evidence at the suppression hearing, the Court declines to consider this proffer.

## III. Conclusion

For the foregoing reasons, the Court GRANTS Tataw's Motion to Suppress. Accordingly, the Court DISMISSES WITH PREJUDICE Count One of the Criminal Information against Tataw. (Docket No. 1.)

An appropriate Order shall issue.

/s/
M. Hannah Lauck
United States Magistrate Judge

Richmond, Virginia
Date: 3-28-11